

JOHN ERIC OLSON
KIPP C. LELAND
**HILL RIVKINS & HAYDEN LLP**
Attorneys for Plaintiff

45 Broadway – Suite 1500
New York, New York  10006
(212) 669-0600

08 CY 7014

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

BUNGE S.A.;                                    :

            Plaintiff,        :    08 CV _____ (     )

     - Against -                           :

METALL UND ROHSTOFF SHIPPING AND   :
HOLDINGS B.V.;                                            **VERIFIED COMPLAINT**
              Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

RECEIVED
AUG 0 6 2008
U.S.D.C. S.D. N.Y.
CASHIERS

       Plaintiff, Bunge S.A., by and through its attorneys, Hill Rivkins & Hayden LLP, as and

for its Verified Complaint against the above-named defendant alleges upon information and

belief as follows:

## JURISDICTION

1.   This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

      Rules of Civil Procedure and this Court has jurisdiction pursuant to 28 U.S.C. §1333 in

      that plaintiff's claim against defendant arises out of the breach of a maritime contract.

**THE PARTIES**

2.  At and during all material times hereinafter mentioned, plaintiff Bunge S.A. ("Bunge") was and now is a corporation existing by virtue of foreign law with an address and place of business at Route de Florissant 13, 1206 Genève, Switzerland, and was the charterer of the M/V Nordflex as under the charter party attached herein as Exhibit A.

3.  At and during all material times hereinafter mentioned, defendant Metall Und Rohstoff Shipping And Holdings B.V. ("MUR") was and now is a corporation existing by virtue of foreign law with an address and place of business at Gold and Diamond Park, P.O. Box 262206, Building No. 4, Suite 226, Sheikh Zayed Road, Dubai, United Arab Emirates, and owned, managed, and/or chartered out the M/V Nordflex.

4.  This action is brought to obtain jurisdiction over the defendant and to obtain security for any judgment that is eventually entered against the defendant.

**AS AND FOR A FIRST CAUSE OF ACTION
AGAINST DEFENDANT FOR BREACH OF CHARTER**

5.  Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 4 as if set forth herein at length.

6. On or about November 15, 2007 Plaintiff chartered the M/V Nordflex from Defendant pursuant to a Time Charter on the New York Produce Exchange Form, a copy of which is attached herein as Exhibit A (hereinafter "Charter").

7. Upon returning the vessel to Defendant at the end of the charter, the captain of the M/V Nordflex misrepresented and/or falsely stated the amount of Fuel Oil and Marine Diesel Oil aboard the M/V Nordflex.

8. The Captain's false information induced Plaintiff to purchase additional Fuel Oil and Marine Diesel Oil and to load the same into fuel tanks aboard the M/V Nordflex immediately before redelivering the M/V Nordflex to the Defendant, so that the vessel would be delivered to the Defendant with the same amount of fuel as when it was received from the Defendant, as required by the terms and conditions of the Charter.

9. After redelivering the M/V Nordflex to Defendant, Plaintiff learned that the fuel levels stated by the Captain of the M/V Nordflex were false, and that when Plaintiff redelivered the M/V Nordflex to Defendant the vessel contained more Fuel Oil and Marine Diesel Oil than it did when Plaintiff took initial delivery of the M/V Nordflex from Defendant.

10. Specifically, Plaintiff was falsely induced by the captain of the M/V Nordflex to redeliver the M/V Nordflex to Defendant with an excess of approximately 520.331 Metric Tons of Fuel Oil and 19.8 Metric Tons of Marine Diesel Oil upon expiration of the Charter.

11. Under the terms and conditions of the Charter, Defendant is obligated to pay Plaintiff $520 per Metric Ton for Fuel Oil and $775 per Metric Ton for Marine Diesel Oil aboard the M/V Nordflex upon redelivery of the vessel at the conclusion of the charter.

12. Accordingly, Defendant is obligated to pay Plaintiff for 520.331 Metric Tons of Fuel Oil at $520/MT ($270,572.12) and for 19.800 Metric Tons of Marine Diesel Oil at $775/MT ($15,345.00), which totals $285,917.12.

13. Defendant has not paid Plaintiff for the excess Fuel Oil and Marine Diesel Oil that it received, in breach of the Charter.

14. Accordingly, under the terms and conditions of the Charter, Defendant currently owes Plaintiff $285,917.12, which Defendant has not paid to Plaintiff, although such payment has been duly demanded.

15. Plaintiff expects to expend approximately $25,000.00 in costs, fees, and disbursements to recover the amounts due from Defendant in arbitration.

16. Plaintiff has duly performed all duties and obligations on its part to be performed.

17. By reason of the premises, Plaintiff has sustained damages, and will otherwise incur costs, as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the total amount of $310,917.12.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST DEFENDANT FOR FRAUDULENT INDUCEMENT

18. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 17 as if set forth herein at length.

19. By reason of the premises, Plaintiff was fraudulently induced to redeliver the M/V Nordflex back to Defendant with more Fuel Oil and Marine Diesel Oil aboard than the amounts aboard when Plaintiff initially received the M/V Nordflex.

20. By reason of the premises, Plaintiff has sustained damages, and will otherwise incur costs, as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the total amount of $310,917.12.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST DEFENDANT FOR UNJUST ENRICHMENT

21. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 20 as if set forth herein at length.

22. By reason of the premises, Defendant was unjustly enriched by Plaintiff in the amount of $285,917.12.

23. By reason of the premises, Plaintiff has sustained damages, and will otherwise incur costs, as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the total amount of $310,917.12.

## ATTACHMENT UNDER RULE B

24. After investigation, defendant cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Plaintiff is informed that defendant has, or will shortly have, assets within this District, including but not limited to, cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank, Citibank N.A.; American Express Bank, Ltd; Bank of America, Bank of New York, Deutsche Bank; HSB; BNP Paribas; Wachovia Bank; ABN Amro; Standard Charted Bank; Bank of Communications; The Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd.; Bank of India and/or any other garnishee as further investigation may uncover.

W H E R E F O R E, plaintiff prays:

1. That process in due form of law according to the practice of this Court may issue against defendant citing them to appear and answer the foregoing, failing which, a default will be taken against them for the principal amount of the claim, plus interest, costs and attorneys' fees;

2.  That if defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, that all assets of defendant up to and including $310,917.12 be restrained and attached, including but not limited to cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank; Citibank N.A.; American Express Bank, Ltd; Bank of America; Bank of New York; Deutsche Bank; HSBC; BNP Paribas; Wachovia Bank; ABN Amro; Standard Chartered Bank; Bank of Communications; The Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd., Bank of India and/or other garnishees upon who a Writ of Maritime Attachment and Garnishment may be served; and

3.  And for such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       August 6, 2008


                        HILL RIVKINS & HAYDEN LLP
                        Attorneys for Plaintiff


                By: _____
                        John Eric Olson
                        Kipp C. Leland
                        45 Broadway, Suite 1500
                        New York, New York 10006
                        (212) 669-0600


29926/VERIFIED COMPLAINT

## VERIFICATION

I, John Eric Olson, hereby affirm as follows:

1. I am a partner with the firm Hill Rivkins & Hayden LLP, attorneys for plaintiff. I have prepared and read the foregoing Verified Complaint and know the contents thereof and, the same is true to the best of my knowledge, information and belief.

2. The sources of my knowledge, information and belief are documents provided by our clients and our discussions with them.

3. As plaintiff is a foreign corporation with no offices, officers or directors located within the Southern District of New York, this verification is made by me as counsel of record.

I hereby affirm under the penalty of perjury that the foregoing statements are true and correct.

Dated: New York, New York
       August 6, 2008

John Eric Olson

# EXHIBIT A



LLOYDS CHAMBERS
1, PORTSOKEN CT
LONDON
E1 8PH
LIMITED
SPENCE &

# ORIGINAL

# Time Charter

### GOVERNMENT FORM

Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **This Charter Party,** made and concluded in *LONDON*, ............................ *15th* day of *November, 2007* ........ 19........

2   Between *METALL UND ROHSTOFF SHIPPING AND HOLDINGS B.V., South Africa*, .................................................

3   Owners of the good Panamanian Flag ........ Steamship/Motorship *"NORDFLEX"* – *See Clause 44 and Vessel Questionnaire attached* of ........

4   of ............................................................ tons gross register, and ........................ tons net register, having engines of ........................ indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed ........................................................

6   at ........................................ of about ........................................ cubic feet bale capacity, and about ........................ tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ships deadweight capacity),

8   allowing a minimum of fifty tons) on a draft of ........................ feet ........................ inches on ........................ Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about ........................................ tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about ........................................ knots on a consumption of about ........................ tons of best Welsh coal – best grade fuel oil – best grade Diesel oil,

11  now ........................................................................................................................................................................

12  and *BUNGE S.A.* ........................................ Charterers of the City of *Geneva* ........................................

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  *about one time charter trip via East Coast South America via safe port(s), safe berth(s), safe anchorage(s) always within IWL, NAABSA*

15  *in East coast South America as per NYPE Clause 6 with intended cargo of grains from Ponta Da Madeira to French Atlantic for*

16  *duration about 40 – 45 days without guarantee* within below mentioned trading limits.

17  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

18  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

19  Vessel to be placed at the disposal of the Charterers, *at on dropping last outward sea pilot BRUNSBUTTEL any time day or night Sundays and*

20  *holidays included.* ........................................................................................................................................................

21  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

22  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her arrival first and

23  subsequent loadport(s) of the first voyage delivery to be

24  ready to receive Charterers intended cargo to Charterers/independent surveyors satisfaction. *Should the vessel fail to pass such survey*

25  *then the vessel to be off-hire from time of failure until vessel is fully accepted. On delivery and throughout the Charter vessel to be with*

26  *clean swept holds and* tight, staunch, strong and in every way fitted for the service, having water ballast, *winches cranes and*

27  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *winches cranes* at one and the

28  same

29  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

30  dise, *including petroleum or its products, in proper containers, excluding See Clause 37* ........................................................

31  (*vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,*

32  *all necessary fittings and other requirements to be for account of Charterers), in such lawful trades,* between safe port and/or ports *and/or safe places in*

33  British North

34  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mexico, and/or South-America Trading Exclusions (See also Clause 67) ............................... and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic,
32  *Charterers have the option with ample notice to Owners to breach Institute Warranty Limits against paying additional premium on hull*
33  *and machinery nett of all rebates according to vouchers from Owners' Hull Underwriters showing additional premium and machinery*
34  *nett of all rebates according to vouchers from Owners' Hull Underwriters showing additional premium*
35  as the Charterers or their Agents shall direct, on the following conditions:
36        1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and watchmen other*
         *than compulsory;* shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current*
    *requirements at ports of call* for and during the service.
39        2.   That, *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory Pilotages, and*
    *also Pilotages in Danish waters in laden condition from Grenaa to Spodsbjerg/Allingea also, if requested by Master due to poor visibility*
    *or adverse weather, Pilotage in English Channel,* Agencies, Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  *of six nine months or more.*
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using
    *shifting boards*
47  for damage, they making good any damage thereto.
48        3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than .......................... tons and not more than
50  .......................... tons and to be re-delivered with not less than .......................... tons.  *See Clause 35.*
51        4.   That the Charterers shall pay for the use and hire of the said Vessel *at the rate of as per Clause 75* ..........................................
52  .......................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on .......................... summer freeboard, per Calendar Month, commencing from the day and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month *day,* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot safe port safe port SKAW/GIBRALTAR Range including UK*
56  *and Eire any time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than
    *15/10 days approximate and 7/5/3/2/1 days definite*
57  notice of vessel's expected date of re-delivery, and probable port.
58        5.   Payment of said hire to be made to *the bank account designated by Owners nett of any deductions/transmitting cost from remitting*
    *bank* in New York in cash in United States Currency, semi-monthly in advance, and for the last half month of
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *(See Clause 62). Time to count from 1 a.m. on the*
    *working day*
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place or anchorage in port or elsewhere that that
69  Charterers or their Agents may
direct, provided the vessel can safely lie always afloat at any time of tide, except at such places in Argentina, Brazil and Buenaventura only where it
is customary for similar size vessels to safely
lie aground. *NAABSA is permitted in East Coast South America only max. once during the duration of this Charter.*

70  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
71  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
72  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
73  ~~paying Owners~~ ............................................ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
74  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency, and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or when*
*required by Charterers or their agents to sign on his behalf* Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *U.S.$10.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., *Charterers to compensate Owners lumpsum U.S.$ 1,000 monthly or pro rata in respect of Charterers'*
*victualling, communication and representation,* ~~paying at the current rate per meal for all such victualling.~~

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and
the con-

89  sumption of fuel *as well as revolution of main engine and velocity of and direction of wind and sea, all in English language.*
90  12.  That the Captain shall use diligence in caring *for the cargo and for the* ventilation of the cargo.
91  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ............................................
92
93  ~~days previous to the expiration of the first named term, or any declared option~~
~~on giving written notice thereof to the Owners or their Agents~~

94  14.  That if required by Charterers, time not to commence before *22nd November, 2007 - 00:01 hours* ............................................ and should vessel
95  not have given written notice of readiness on or before *28th November, 2007 - 23:59 hours* ............................................ but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15.  That in the event of the loss of time from deficiency *and/or default and/or strike of crew and/or* men *or deficiency of* stores, fire,
98  breakdown or damages to hull, machinery or equipment,
grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
*whatsoever*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all extra expenses may be deducted from the*
*hire;* and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.

102 16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

17.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London, New York~~, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *See further Arbitration Clause 30.*

18.   That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
~~age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not permit, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.~~

19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules 1974 *as amended 1994 or any amendment thereto at London, and as to matters not provided for by these rules, according to the law and usages of London.* ~~1924, at such port or place in the United States as may be selected by the carrier, and to to matters not provided for by these~~

~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on dates when made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money. Charter hire not to contribute to General Average.~~

~~In the event of accident, danger, damage or disaster, before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20.   Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and serves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21.   ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

22.   Owners shall maintain the gear of the ship as fitted, providing gear (for all ~~derrick~~ *cranes*) capable of handling lifts up to *their maximum capacity in accordance with the Description Clause,* ~~three tons, also~~
~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts,~~ Owners are to provide necessary gear for ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light* on deck and in cargo holds as on board *sufficient for night work in all holds simultaneously.* ~~lanterns and oil for~~
~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The Charterers to have the use of any gear on board the vessel.

23.   Vessel to work night and day, if required by Charterers, and all *cranes and/or grabs* winches to be at Charterers' disposal during loading and discharging;
~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen, deck hands, and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 port, or labor unions, prevent crew from driving winches; shore cranemen ~~Winchmen~~ to be paid by Charterers. In the event of a disabled *crane and/or grab winch or cranes and/or grabs unless caused by stevedores, winches,* or

149 insufficient power to operate *crane and/or cranes and/or grabs,* winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time *and extra expenses, including but net limited to standby expenses,* occasioned

150 thereby.

151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *attached Protective Clauses.* ~~the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder.~~
155

~~U.S.A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160

~~Both-to-Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able to safely enter the
169 port or to get out after having completed loading or discharging. *Notwithstanding contents of Clause 25 Owners and Master are bound by contents of approved Ice Clauses such as, but not limited to GENCON and NORDICE when incorporated in such Charters hereunder. Vessel never to force nor push ice nor to follow Ice breaker.*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to *Simpson, Spence and Young, London*

173 on the hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

174 28. An address commission of 3.75 1 1/4 per cent payable to Charterers................ on the hire earned and paid under this Charter.

175 *Clause 29 through 93 are fully incorporated in this Charter Party.*

CHARTERERS:



OWNERS:
For and on behalf of
Metall Und Rohstoff Shipping and Holdings B.V.
For Simpson, Spence & Young
As Agents only.

Director.
By written authority received from Owners.

**SSY**

SIMPSON SPENCE & YOUNG

<u>RIDER CLAUSES TO M.V. "NORDFLEX"</u>
<u>CHARTER PARTY DATED 15TH NOVEMBER, 2007.</u>

29.  <u>Additional Fittings</u> :
Charterers to have the option of welding padeyes and angles, except on fuel tank tops and hoppers, at their own arrangement and expense subject to Master's prior consent and supervision.
Charterers to remove all padeyes and angles at Charterers' time and expense under the Master's supervision before redelivery, unless Owners request Charterers to maintain same without removal, in which case Charterers will be free from removing padeyes and angles.

30.  <u>Arbitration</u> :
This Charter Party shall be governed by English Law. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (L.M.A.A.) terms current at the time when the arbitration proceedings are commenced.
It is hereby agreed that all claims below U.S.$ 50,000 excluding interest and costs, shall be settled as per L.M.A.A. Small Claims Procedure current at the time when the arbitration proceedings are commenced.

31.  <u>Arrest</u> :
Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel except that arrest is caused by cargo claims to which Owners/Master are not responsible, or claims incurred due to irregularity of Bills of Lading issued under Charterers' Letter of Indemnity, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the Clause no hire is payable.

32.  <u>Asian Gypsy Moth</u> :
Owners guarantee that upon delivery to Charterers the vessel is free of any infestation by the Asian gypsy moth or its eggs. Should the Owners fail to fulfil their guarantees as above, the Owners shall indemnify the Charterers from any loss or damage sustained by Charterers and all consequences arising from/in connection with such failure including but not limited to any delay, extra expenses, fines, cost of removal of such moth or its eggs and/or even transhipment of cargo if on board, regardless of whether or not the vessel would be banned from entering into or ordered to leave the Canadian and/or U.S. Waters/ports because of said failure. When Charterers direct the vessel to the area infested by Asian gypsy moth, Charterers shall, at Charterers' time and expense, undertake to arrange a certificate issued by an appropriate authority of such area/port certifying that the vessel is free from infestation by Asian gypsy moth or its eggs, and thereby Owners shall not be held responsible for any consequences at the next destined ports.

33.  <u>Bills of Lading</u> :
The Charterers or their agents are authorised to issue and sign Bill of Lading and/or Sea Way Bills on Charterers' form on Owners' and/or Master's behalf, in which case the Charterers to indemnify Owners against all consequences or liabilities arising from their so signing of Bills of Lading and/or Sea Way Bills on Owners' behalf.

34.  <u>Bulldozers</u> :
Charterers to have the option to use the bulldozers in vessel's holds, provided not exceeding the tanktop strength. If required the vessel to lift onboard the bulldozers by use of vessel's gear.

35.  <u>Bunkers</u> :
Bunkers on delivery to be as on board which expected to be about 600/700 metric tons IFO and about 20/30 metric tons MDO.
Bunkers on redelivery to be about same quantity as actually on board on delivery.
Bunker prices both ends : U.S. $520 per metric ton Intermediate Fuel Oil and U.S. $775 per metric ton Marine Diesel Oil.

36.  <u>Cargo Claims / P. and I. Club</u> :
Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association, which is a member of the Group of International P. and I. Clubs, for the duration of this Charter Party. Entry shall include, but not be limited to, ordinary cover for cargo claims.

**SSY**

**RIDER CLAUSES TO M.V. "NORDFLEX"**
**CHARTER PARTY DATED 15TH NOVEMBER, 2007.**

SIMPSON SPENCE & YOUNG

In the case of damage to and/or loss of cargo carried on the vessel in which Owners and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of such in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims, as between Charterers and Owners, shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996 and its subsequent amendments.

Owners' P. and I. Club        :        Gard.
Charterers' P. and I. Club    :        To be advised.

If required by Charterers, Owners to authorise and instruct Owners P. and I. Club to confirm directly to any party as ordered by Charterers that the vessel is fully covered for P. and I. and that collection of premiums are up to date.

37.    Cargo Exclusions :
It is understood that the vessel is not employed in the carriage of the following cargoes :

Fishmeal, caustic soda, direct reduced iron ore in lumps or pellets, livestock, logs, asphalt, copra, motor spirits, motor blocks/turnings, nitrate of ammonia (unless fertilizer grade), arms, ammunition, explosives, injurious, inflammable and dangerous goods, petroleum and its products (see below regarding petcoke), acids, ferro silicon, creosoted goods, sunflower seed expellers, nuclear materials or fuels, radioactive products, waste and acids, wet hides, calcium carbide, naphtha, pitch, tar, HBI and Indian coal.
Charterers have the option to load concentrates provided they observe all existing laws, rules, regulations and directions of the authorities and classification societies, as well as I.M.O. and relevant national regulations.

Nitrates to be allowed provided lead, magnesium and Chilean are excluded.

Aggregates to be allowed but same cannot be carried consecutively.

Lumber :
Vessel do not equip CO2 fire-extinguishing system in hold. Therefore, only unseasoned lumber to be allowed to be loaded under Section 53 of SOLAS. The vessel does not have lashing equipment/materials and if lashing equipment/materials are necessary, these will be arranged by the Charterers.

Pig Iron :
Pig iron to be allowed provided :
Cargo not to be dropped from conveyor belt. First layer of pig iron not to be released until touching tank top in order to provide a proper cushion to Master's satisfaction. Vessel's deck, hatch coamings and super structure to be sufficiently covered in plastic to Master's satisfaction, and same to be at Charterers time and expense.

Charterers may load maximum six (6) dirty cargoes out of the following cargoes :

Two (2) cement
Two (2) petcoke
Two (2) scrap
One (1) salt
One (1) sulphur

Cement :
Cement/cement clinker in bulk may be loaded provided that :

1)    Maximum two (2) cargoes of cement in bulk, which shall not be consecutive voyages and also not to be the last cargo prior vessel's delivery.

2)    Maximum 2 consecutive trades of each 2 up to 4 cargoes of cement clinker per year but not to be the last cargo prior vessel's redelivery. After completion of last voyage of a consecutive cement clinker trade, Charterers shall reimburse special crew bonus for cleaning on top of usual intermediate hold cleaning compensation.

**SSY**

SIMPSON SPENCE & YOUNG

RIDER CLAUSES TO M.V. "NORDFLEX"
CHARTER PARTY DATED 15TH NOVEMBER, 2007.

3)      Upon vessel's delivery or soon thereafter Charterers to supply vessel with 2 pieces electric submersible mucking pumps, one portable assembly scaffolding tower to be used by vessel's crew for hold cleaning. Above tools and equipment shall be kept and maintain by vessel's crew as well as vessel's own gear.

4)  i)     Charterers endeavour to use ship's permanent cement holds in hatch covers but if size and location are not suitable, Charterers have the option to cut holes in hatch covers for loading bulk cement.

    ii)    All cutting and restoring of the holes to be supervised/attended/approved by class surveyor.

    iii)   All time for cutting/restoring up to class surveyors' satisfaction as well as all expenses including class surveyors' fees and expenses shall be for Charterers' account.

    iv)    Charterers to pay Owners U.S.$ 150.00 per hold as compensation for Owners' purchase of necessary equipment to remove cement/cement clinker against Owners' request.

    v)     All hatches in holds with cargo to be well maintained, especially loading cement/cement clinker. Owners to seal all hatches where cargo (bulk cement/ cement clinker) loaded by ramnek or equivalent tape at Owners' time if required by Charterers but cost of such tape to be reimbursed by Charterers upon completion of loading, Master/crew are instructed to clean hatch ceilings and grooves before closing hatches, properly tighten up hatches, for water weathertight in order to avoid water leakage through hatch covers.

Salt :
Maximum one (1) cargo of salt, which not to be the last cargo prior to vessel's redelivery.  Holds to be limewashed prior to loading salt and fresh water rinsed after discharge at Charterers' time and expense.  If requested by the Charterers, crew to perform above services against Charterers' paying lumpsum U.S.$ 500 per hold.

Sulphur :
Maximum one (1) cargo of sulphur (sulphur loading always excluding Hold Number 5) which not to be the last cargo prior to vessel's redelivery.  Sulphur to be loaded, stowed, carried and discharged strictly in accordance with applicable national/international regulations and/or I.M.O. Code and recommendations.  Charterers to arrange, at Charterers' time and expense, to clean the holds thoroughly and then limewash the holds to Master's satisfaction.

After discharge, Charterers, at Charterers' time and expense, to wash down the cargo holds with fresh water to Master's satisfaction.  If requested by the Charterers, crew to perform above services against Charterers' paying lumpsum U.S.$ 500 per hold.

Vessel to remain on hire during the above, and Owners shall not be held responsible for time/ cost/expenses so lost and incurred if vessel does not pass the hold inspection for the next cargo after carriage of sulphur.

Petcoke :
Maximum two (2) cargoes of petcoke may be carried provided that the Charterers shall make best endeavours to avoid to load petcoke with the temperature at the time of loading exceeding 55 degrees C.

In case any extra cost is necessary in order to comply, any regulations in accordance with B.C. Code to take petcoke with the temperature at the time of loading exceeding 55 degrees C, then such extra cost is for Charterers' account.

In case the vessel is not equipped with high pressure hoses, Charterers are to provide the same so that the vessel's holds can be thoroughly cleaned after discharge of petcoke.

Any extra time taken for hold cleaning shall be on hire, and Charterers shall negotiate and pay any extra hold cleaning bonus required directly with/to the Master.

- 3 -

**SSY**

SIMPSON SPENCE & YOUNG

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

Scrap :
Maximum two (2) cargoes of scrap, HMS 1/2 and/or shredded scrap or better grade/less harmful, always excluding oily scrap and motor blocks and turnings. The first layer of scrap to be lowered as close as possible to vessel's tanktop in order to provide a proper cushion to Master's satisfaction. Scrap not to be the last cargo prior to redelivery.

38.    Certificates / Vaccinations :
Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, enabling the vessel to obtain radio free pratique.

If requested, Owners to provide Charterers with copies of any and all such certificates/ approvals.

Any time lost and all extra expenses resulting from Owners' non-compliance with the above to be for Owner's account and may be deducted from hire.

39.    Crew Service :
With reference to Clause 8 of this Charter Party "customary assistance" shall include but not be limited to :

   a)    All opening and closing of hatches, when and where required.
   b)    Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.
   c)    Shaping up vessel's holds/hatches and crews, if fitted, as much as possible prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew required under this Charter Party.

40.    Deck Cargo :
Charterers may load cargo on deck/hatchcovers subject to the approval of the Master of the vessel without Owners'/Master's liability for loss and/or damage howsoever caused, that cargo is being loaded, lashed and secured in such a manner so as not to affect the vessel's stability or exceed the permissible strength of the deck and the hatchcovers, however, always at the Charterers' risk and expense including supply of loose lashing fittings as required in accordance with the vessel's Cargo Securing Manual approved by her Classification. Bills of Lading covering deck cargo to be marked "Carried on deck at Shippers' risk without responsibility for loss or damage howsoever caused".
If the deck cargo is being carried to or from the United States, the following wording should be used "Carried on deck at Shipper's risk as to perils inherent in such carriage. In all other respects the risk shall be subject to the provisions of the U.S. Carriage of Goods by Sea Act 1936 except that with respect to deck cargo, Owners will not have the burden of proof with respect to any claim arising from or related to allegations of unseaworthiness and that burden will rest with the Shippers and/or cargo interests."

41.    Deductions :
The Charterers may deduct from the Charter hire U.S.$ 500 (Five Hundred Dollars) per port call disbursed for Owners' account. In addition Charterers may deduct from the last hire payment the reasonable estimated expenses incurred by Charterers for Owners' account, notwithstanding that vouchers may not then have reached Charterers for submission to Owners, provided that the difference between estimated expenses and actual expenses shall be adjusted and settled if vouchers available.

42.    Delivery of Cargo Against L.O.I. :
   (a)    If original Bill(s) of Lading are not available at discharging port, Owners agree to release the entire cargo to the Charterers' order against presentation by Charterers or their Agents of a single letter of indemnity in wording as per Owners' standard P. and I. Club form signed by Charterers only. Discharge to commence on receipt by Owners of a faxed copy of the L.O.I. and the original L.O.I. to be mailed to Owners.

- 4 -

**SSY**

SIMPSON SPENCE & YOUNG

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

    (b)    In the event that Charterers instruct the vessel to change discharging port after Bills of Lading or sea waybills have been issued, Owners shall comply with such instructions upon receipt of a faxed copy of a single L.O.I. always giving reasons for deviation, on Owners' standard P. and I. Club wording signed by Charterers only.

43.    <u>Delivery / Redelivery Time</u> :
Delivery and redelivery time to be calculated basis Greenwich Mean Time.

44.    <u>Description of the Vessel</u> :
    1)    Vessel's Name : m.v. "NORDFLEX"
    2)    Vessel is a regular singledeck bulk carrier with engine/bridge aft.
    3)    Month / Year of build and where : August, 2002 - Tsuneishi.
    4)    Flag / Port of Registry : Denmark - København
    5)    Class including class of vessel's gear and tackle : Class : B.V.
    6)    Owners / Timecharter Owners / Managers full style : To be advised
    7)    P. and I. Club (Original Owners and Timecharter Owners, if any) : Gard.
    8)    Vessel / Owners ISM Certified – Affirmative when/where : Immediately after take over.
    9)    H. and M. Value / Full Style of Underwriters : U.S.$ 34 million – Tryg.
    10)    Registration No. : D4204.
    11)    Call Sign, Telex, Phone, Fax and E-Mail Numbers :

| | |
|---|---|
| Call Sign | O V I J 2 |
| HF Telex | 03596 FLEX |
| B Tlf | 3 220 419 20 |
| B Fax | 3 220 419 21 |
| B Tlx | 3 220 419 23 |
| Sat C | 4 220 419 10 |
| E-mail | nordflex@amosconnect.com |
| MMSI | 220 419 000 |
| Mobile Phone | +45 20 20 11 68 |

    12)    Master's Name / Master's / Crew's Nationality and Number of Crew : Captain Kim Aarup (Danish) / 16 Filipino Officers and ratings.

    13)    DWAT S/W/T and corresponding Drafts / TPC Lightweight :
    (specific gravity of sea water 1.025)

| | D/W (T) | Draft Mld (M) | TPC (T) |
|---|---|---|---|
| Summer : | About 52,277 | About 12.00 | To be advised |
| Winter : | About 50,892 | About 11.75 | To be advised |
| Tropical : | To be advised | To be advised | To be advised |

    14)    Constant Weight :

    15)    GT / NT – Suez / Panama GRT / NRT :
    GT (International) : 30,085
    NT (International) : 18,207

    Suez / Panama GT / NT :  Suez (GT/NT) : About 31,300 / About 28,500
    Panama (GT/NT) : To be advised / About 25,200

    16)    Principal Dimensions :

| | | |
|---|---|---|
| L.O.A. | : | About 190.00 metres |
| L.P.P. | : | About 182.00 metres |
| B. MLD | : | 32.26 metres |
| D. MLD | : | 17.00 metres |
| Designed Draft MLD | : | m |
| Scantling Draft MLD | : | m |

- 5 -

**SSY**

SIMPSON SPENCE & YOUNG

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15ᵗʰ NOVEMBER, 2007.

17) AHL Fitted / Grain Fitted / CO2 Fitted in Holds.
    A)      To be fitted in all cargo holds.
    B)      To be advised.
    C)      Sea water fire extinguishing system to be provided in cargo hold.

18) Natural ventilation to be provided in cargo hold.

19)
| Daily fresh water consumption | : | About | mt / day |
| Fresh water capacity | : | About 400 M3 | |
| Capacity of generator | : | To be advised | |

20) Cargo Gear :
    Electro-hydraulic driven type    :    30.5 T SWL x 4 sets

    No. 1 DK Crane : Between No. 1 and No. 2 Hold
    No. 2 DK Crane : Between No. 2 and No. 3 Hold
    No. 3 DK Crane : Between No. 3 and No. 4 Hold
    No. 4 DK Crane : Between No. 4 and No. 5 Hold

    a)    Maximum outreach from shipside and corresponding SWL outreach from ship's breadth : m at
                t swl
    b)    Hoisting :    for hook handling    t x    m/min (*)
                                  t x    m/min (*)
                for grab handling    t x    m/min (*)
                (   t shall include grab and cargo weight)

                Slewing :        rpm (*)
                Marked with (*) may be changed depending on manufacturer

21) Grabs : Four (4) sets of electro-hydraulic (type) grabs 12 M3 / 6 M3

22) Hatch number and size shall be as follows :
    No. 1 Hatch    About 20.40 metres (length) x 18.40 metres (breadth)
    No. 2 Hatch    About 21.25 metres (length) x 18.40 metres (breadth)
    No. 3 Hatch    About 21.25 metres (length) x 18.40 metres (breadth)
    No. 4 Hatch    About 21.25 metres (length) x 18.40 metres (breadth)
    No. 5 Hatch    About 21.25 metres (length) x 18.40 metres (breadth)

| Hatchcover | : | Weathertight, double skinned, steel hatchcover both ends folding (4 panels for each hatchcover) |
| Operation method | : | Hydraulic cylinders |
| Securing system : | | Manual quick acting cleat |

23) Number of Holds :    Five (5)

    a)    Hold dimensions per hold (L X B x H) "H" means height from tanktop to upper deck center
        line :

| | L (M) | x | B (M) | x | H (M) |
|---|---|---|---|---|---|
| No. | | x | | x | |
| No. | | x | | x | |

    b)    Tanktop plate floor dimension :
        Tanktop height : mm
        Floor space :    max    mm

    c)    Maximum height from tanktop to top of hatchcover : About   m

    d)    Confirm no obstacles/obstructions/pillars/container shoes/in holds or on tanktops.

**SSY**

SIMPSON SPENCE & YOUNG

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

24) Hold Capacities :

|  | | Grain | Bale |
|---|---|---|---|
| No. 1. Hold | : | About 12,590 M3 | About 12,170 M3 |
| No. 2. Hold | : | About 14,560 M3 | About 14,130 M3 |
| No. 3. Hold | : | About 13,407 M3 | About 13,010 M3 |
| No. 4. Hold | : | About 14,455 M3 | About 14,000 M3 |
| No. 5. Hold | : | About 12,488 M3 | About 12,230 M3 |
| Total : | | About 67,500 M3 | About 65,540 M3 |

25) Maximum permissible uniform load :
   On tanktop :   No. 1 and 5 Hold About 22.00 T/M2
                  No. 2 and 4 Hold About 17.00 T/M2
                  No. 3                About 25.00 T/M2
   On deck :                          About 3.46 T/M2
   On hatchcovers :                   About 1.75 T/M2

26) Height waterline to top of hatchcoaming first and last hatch : To be advised.

27) Thickness of tanktop plating to be determined for grab handling in accordance with the requirement of NK rule.

28) Speed / Consumption :
   Under good weather condition upto and including Beaufort Force 4
   Laden : About 14.0 knots
   Ballast : About 14.5 knots

   Consumption for above 2 cases :
   About 29.3 metric tons Intermediate Fuel Oil for main engine
   About 2.0 metric tons Intermediate Fuel Oil plus about 0.2 metric tons Marine Diesel Oil for auxiliary/engine.

   Bunker grade Intermediate Fuel Oil (IFO-380 CST) ISO 8217 RMH35 and Marine Diesel Oil ISO8217 DMB. Vessel entitled to use more Diesel Oil at narrow/shallow/ busy water area and engine starting/stopping.

   In Port :
   Idle : (24 hours) :   I.F.O. 2.5 metric tons   M.D.O. 0.5 metric tons
   24 hours working :    I.F.O. 5.0 metric tons   M.D.O. 1.0 metric tons

29) Vessel is not a member of fuel oil testing such as FOBAS or DNV Petroleum Service.

30) Maximum Bunker Capacities : About 2.250 M3.

31) Ballast tank capacity and hold ballast capacity in mts :
   Ballast tank capacity including peak tanks : About 28,500 M3 (including No. 3 Hold)
   Hold (No. 3) ballast capacity : About 13,448 M3

   a)   Time for full de-ballasting including and excluding floodable hold :
        Time for deballast at normal ballast condition excluding No. 3 hold ballast : About    hours without stripping
        Time for deballast at heavy ballast condition excluding No. 3 hold ballast : About    hours without stripping

32) Freshwater tanks available : About 400 M3

33) a)   Depth Moulded : 17.00 metres
    b)   Distance from keel to vessels highest point : To be advised

- 7 -

**SSY**

SIMPSON SPENCE & YOUNG

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

34) Alternate holds loading :
The combination of No. 1 Hold, No. 3 Hold and No. 5 Hold shall be used for one alternate loading.

According to new legislation vessel will only be able to do alternate hold loading upto 1st July, 2006.

35) Deckspace free of obstacles/cargo battens/stanchions. Major outfittings on deck space shall be arranged as follows :
Small piping such as wash deck/fire line, compressed air line shall be arranged at hatch coaming side. Grab stowing space (4 sets) shall be provided on upper deck and auxiliary. Pilot ladder hoist stowing space shall be provided at No. 5 Hold both side on upper deck.

36) a) Supports for uprights for timber cargo :
Maindeck : Distance between each support for upright shall be        m on each side of upper deck
c) Lashing eyes for packaged lumber :
Distance between each lashing eye for packaged lumber shall be        m on each side of upper deck

37) The vessel is ITF fitted.

38) The vessel is not Ice Classed.

39) Owners' Bankers : To be advised.

40) U.S. grain carriage within        months : Not applicable.

41) Hold cleaning shall be carried out using fire hose with nozzle via fire hydrant which is arranged near the hatch coaming side.

42) Cement loading hatch on each hatch cover shall be        mm diam. x        sets.
Cement feeder hatches shall be utilized as grain feeder hatches.

OWS CFM VSL GEAR ARE IN FULLY WORKING CONDITIONS AND TO BE SO MAINTAINED AT CHRTS DISPOSAL FOR THE ENTIRE DURATION OF CP

OWS GTEE THAT VSL IS AND WILL REMAIN FOR THE WHOLE DURATION OF THIS CP CLASSED HIGHEST LLOYDS OR EQUIV

OWS GTEE THAT VSL IS AND WILL REMAIN FOR THE WHOLE DURATION OF THIS CP FULLY P+I COVERED

OWS GTEE THAT VSL IS AND WILL REMAIN FOR THE WHOLE DURATION OF THIS CP FULLY H+M INSURED

OWS GTEE VSL FULLY ISM COMPLIANT - BIMCO STANDARD ISM CL TO APPLY

OWS GTEE VSL IS GRD ST BC SUITABLE FOR GRAB DISCH

45) Double Banking :
Charterers have the right to load and/or discharge on double banking basis at loading and/or discharge port at a safe dock or wharf or anchorage where it is customary and safe for vessels of similar size and type to do so always subject to Master's reasonable satisfaction . Any additional equipment/facilities such as fenders whenever considered necessary by the Master are to be supplied by the Charterers in their time and at their expense. If at any time during the operation, the Master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account. Amount not to exceed the premium calculated on the basis of an advisory rate quoted by the Chairman of Breach of Warranty Committee on the London market.



RIDER CLAUSES TO M.V. "NORDFLEX"
CHARTER PARTY DATED 15ᵀᴴ NOVEMBER, 2007.

SIMPSON SPENCE & YOUNG

46)  Houseflag / Markings :
The Charterers shall have the liberty of flying/marking their own flag at their expense.

47)  Boycott :
Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a bona fide union agreement, the standard of which is fully acceptable to the ITF and Unions in all countries not excluded in this Charter Party.  In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotages assistance or any other restrictions, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra expenses incurred due to above are to be for Owners' account and may be deducted from hire.  Owners are also responsible for any claim that may be presented by third party.

48.  In Lieu of Hold Cleaning :
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of U.S. $4,500 in lieu of such cleaning including dunnage removal/disposal and washing/drying up.

49.  Deleted.

50.  Insurance :
Premium for annual war risk insurance on hull and machinery and Officer/crew always to be for Owners' account.  Any additional premium nett of all rebates in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by vessel's war risk Underwriters to be for the Charterers' account, however, not to exceed what would have been quoted or charged if the vessel was covered on the London market.

If Owners have not covered basic war risk insurance, Charterers only to pay differential as if Owners were covered, and only against presentation of Underwriters' original invoice.

51.  Intermediate Hold Cleaning : - Deleted.

52.  Forklift trucks/bulldozers/grabs/magnets etc., shall be allowed to be used in the holds if necessary, provided always within the vessel's permissible load.

53.  Loading of Steel :
Steel cargoes to be sufficiently dunnaged/lashed/secured and unlashed/unsecured at Charterers' expenses, risk and in their time by stevedores under the supervision of the Master and up to his satisfaction.

Charterers agree, if so requested by Owners, to jointly appoint an independent surveyor to perform a preloading survey of the cargo with time and cost equally shared.

54.  Deleted.

55.  Off-Hire :
Should the vessel put back whilst on voyage by reason of an accident or breakdown, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person onboard the vessel (other than passengers or Supercargo travelling by request of the Charterers) or by reason of refusal of the Master or crew to perform their duties, or oil pollution even if alleged, or capture/seizure, or threatened detention by any authority/legal process, the hire shall be suspended from the time of inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option, and voyage resumed therefrom.  All extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 10 days, the Owners to give the Charterers not less than 5 days estimated notice of resumption of the service.



# RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

If the vessel has been off-hire for a period of more than 40 days, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.

The Charterers may in their option at any time add to the Time Charter period, partly or wholly any off hire period(s). The rate of hire for any such period(s) shall be paid at the same rate as that applicable during the off hire period(s).

56. <u>Oil Pollution</u> :
Owners guarantee to provide and maintain, during the entire time charter period, at their expense and carry on board the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where such certificates and/or guarantee are required. All such certificates to be valid throughout the entire time charter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any direct consequential losses, damages or expenses.

57. <u>On/Off-Hire Survey</u> :
At port of delivery, in Owners' time and at last discharge port prior to redelivery, in Charterers' time, a joint on/off-hire survey to be held by a single independent surveyor jointly appointed. Cost of same to be equally shared between Owners and Charterers. Vessel only to be off-hire for actual working time lost due to surveys. Such survey to be in Charterers option, but then Masters figures to be binding for both parties.

58. <u>Panama / Suez Canal</u> :
Owners warrant that the vessel is fitted for the transit of the Suez and the Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with all warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant authority, Charterers may suspend hire for all time lost and Owners to pay all expenses arising as a consequence of Owners' failure to comply with the warranty.

59. <u>Plans</u> :
Owners to courier to the Charterers Capacity Plan, Deadweight Scale and General Arrangement Plan upon delivery or as early as possible thereto.

60. <u>Power Clause</u> :
The vessel to supply free of expense to Charterers 440 volt 3 phase 60 cycles per crane from the slip ring of the crane within the maximum capacity of 350 ampere provided that cranes of the vessel cannot be used for operation and left idle. Charterers have the right to fit magnets or other loading/discharging equipment customary to the trade onto vessel's cranes subject to vessel's lifting capacity. Charterers to arrange the outlet/socket/suitable cabtire cables and other necessary fittings at the Charterers' time, risk and expense.

61. <u>Protective Clause</u> :
The New Jason Clause, Both-to-Blame Collision Clause, New Both-to-Blame Collision Clause to be read as per standard printing and not be influenced by any mistyping, the General Paramount Clause, U.S. Clause Paramount, Canadian Clause Paramount, Conwartime 2004, P. and I. Bunkering Clause, as applicable and attached are all to be considered incorporated into this Charter Party and all Bills of Lading issued under this Charter shall include all said clauses.

The U.S.A./Canadian Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. or Canada as applicable to be incorporated in all Bills of Lading.

62. <u>Punctual Payment</u> :
Referring to line 60 and 61 : Where there is any failure to make "punctual and regular payment", Charterers shall be given by Owners 3 banking days written notice excluding Saturdays, Sundays and Holidays to rectify the failure before exercising any right of withdrawal, and where so rectified the payment shall stand as punctual and regular payment.

**RIDER CLAUSES TO M.V. "NORDFLEX"**
**CHARTER PARTY DATED 15TH NOVEMBER, 2007.**

**SSY**

SIMPSON SPENCE & YOUNG

63.  Sea Carrier Initiative Agreement :
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

64.  Deleted.

65.  Stevedore Damage :
Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to :

a)  Give written notice to the Charterers or their agent or servant within 24 hours of full particulars of the damage caused and name of the party allegedly responsible for the damage.

b)  Promptly but latest within 24 hours of the occurrence give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party or failing that, the acknowledgement of receipt of such notice.

c)  Immediately arrange, in conjunction with Charterers' agents, for the damage to be surveyed and an estimate of the repair costs given. Such time spent for damage survey shall be counted on hire and surveyors' fees to be paid by Charterers.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage which must be attended to, as per the above procedure immediately it is discovered but latest prior to redelivery.

66.  Taxes :
Taxes and/or dues and/or charges whatsoever, imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

67.  Trading Limits :
World wide trading via safe port(s), always safely afloat at any time within Institute Warranty Limits excluding Cuba, North Korea, Cambodia, Israel, Libya, Turkish occupied Cyprus, Somalia, Liberia, Sierra Leone, Democratic Republic of Congo, Russian Pacific ports, Lebanon (but the Charterers are allowed to call Chekka for discharge subject to the prior written consent of the Owners/Master, which shall not be unreasonably withheld) and Iraq (but the Charterers are allowed to call Iraq for the discharge of U.N. approved cargoes) and/or countries banned and/or boycotted by the U.N. and war/warlike zones.

No direct sailing between Peoples Republic of China and Taiwan.

Yemen to be allowed provided any cargo claims or arrest to be at Charterers responsibility and the vessel to remain on-hire even when under arrest.

The Charterers have the option to break Institute Warranty Limits, provided that the Charterers to reimburse extra insurance incurred thereby nett of all rebates as per vouchers from Owners' underwriters.

68.  Deleted.

69.  Warranties :
Owners warrant that the vessel :

-  is not blacklisted by Arab countries nor anywhere else within the agreed trading limits.
-  has not traded Cambodia, Cuba, Israel and North Korea.
-  is eligible for bunkers in the United States of America, its territories and possessions, in accordance with directive from the United States Department of Commerce, Office of International Trade.

- 11 -



## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

70.    Watertight Hatches :
       The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's
       hatchcovers are watertight. All hatches are to be carefully attended by the crew to prevent leakage.

71.    Weather Routing :
       The Charterers may supply an independent weather bureau advice to the Master, during voyages specified by the
       Charterers and the Master shall comply with the reporting procedure of the weather bureau, however, the Master
       remains responsible for the safe navigation and choice of route. Evidence of weather conditions shall be taken
       from vessel's deck logs and independent weather bureau's reports. In the event of a discrepancy between deck
       logs and the independent weather bureau's reports, the independent bureau's reports shall be taken as final and
       binding on both parties.

72.    Deleted.

73.    This fixture to be kept strictly private and confidential.

74.    Deleted.

75.    Hire Details / Periods :
       1)    Period    :    Minimum 11 (eleven) months to maximum 13 (thirteen) months in Charterers option.

       2)    Hire       :    U.S.$ 70,000 (Seventy Thousand Dollars) daily including overtime.

                              Hire payable to                :        Nordea Bank Denmark A/S,
                                                                      Strandgade 3,
                                                                      0900, Copenhagen C.
                              Credit USD Account No.  :                5005 553795
                              In favour of                   :        D/S "Norden" A/S
                              Swift Code                     :        NDEADKKK
                              Reference                      :        m.v. "NORDFLEX" / MUR
                              New York Corresponding Bank :             JP Morgan Chase Bank,
                                                                      New York,
                                                                      N.Y.
                              Swift                          :        CHASUS33

                              Hire payable into Owner's bank account nett of any deductions/ transmitting cost
                              from remitting bank.

76.    Deleted.

77.    Bill of Lading :
       When and if required Charterers may carry one original Bill of Lading onboard against which the cargo may
       properly be released on instructions received from Shippers/Charterers. All such Bills of Lading must
       incorporate the following wording : "One original Bill of Lading retained on board against which Bill delivery
       of cargo may properly be made on instructions received from Shippers/Charterers".

78.    I.S.M. :
       From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the
       vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and
       "the Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code. Upon
       request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety
       Management Certificate (S.M.C.) to the Charterers. Any, loss, damage, expense or delay caused by failure on
       the part of the Owners or "the Company" to comply with the I.S.M. Code shall be for the Owners' account.

79.    Deleted.

80.    Deleted.



**RIDER CLAUSES TO M.V. "NORDFLEX"**
**CHARTER PARTY DATED 15TH NOVEMBER, 2007.**

SIMPSON SPENCE & YOUNG

81. Charterers have the option to perform hose/pressure/ultrasonic or similar test at their own expense, in case the vessel fails such survey Owners to rectify the same at their own time and cost and cost and time of the subsequent test(s) to be for Owners' account.

82. Crane Drivers :
Charterers have the option to arrange crane drivers for loading or discharging operations which will stay onboard the vessel which will provide suitable resting/sleeping area. Charterers to pay U.S.$ 10.00 per crane driver per day to Owners covering suitable accommodation onboard and providing suitable meals.

83. BIMCO Year 2000 : - Deleted.

84. Inspection :
The Charterers or their nominee has the right to inspect the vessel and its records at any given time during the currency of this Charter. Owners/crew are to fully co-operate during such inspection. Vessel to remain on hire during inspection(s) ordered by Charterers.

85. Lay-Up :
The Charterers shall have the liberty to order the laying up of the vessel at a safe berth or port for any period of this Charter. In the event of such lay up, Owners shall promptly take steps to effect all possible economies in operation costs if so required by Charterers. The Owners will estimate all such savings including (but not limited to) reductions in insurance and manning costs. If the vessel is laid up the Charter hire shall be reduced by the amount of any savings actually made by the Owners during the laying up period.

Charterers shall bear any expenses related to re-activation of the vessel. Owners shall not be penalized for reduction of speed due to marine growth after laying up and bottom cleaning, if required, shall be held at Charterers' time and expense.

86. War Cancellation :
In the event of war between/among People's Republic of China, Russia, United States of America, Britain, Japan and/or Denmark, which could affect the performance of this Charter, both the Charterers and the Owners have the option of cancelling this Charter Party. In any event such cancellation shall take place after discharge of cargo at the destination.

87. Vessel's Performance :
If the Charterers have reason to be dissatisfied with the performance of the vessel provided for in the Charter Party, the Owners on receiving particulars of complaint(s) shall immediately investigate and take appropriate steps to correct the situation.

88. Deleted.

89. Deleted.

90. Deleted.

91. Deleted.

92. Sea Waybills :
Whenever Charterers issue Sea Waybills instead of Bills of Lading, such Sea Waybills shall always be deemed to incorporate all the terms and conditions, liberties, clauses and exceptions of this Charter Party including the Law and Arbitration Clause, Paramount Clause, General Average Clause, New Jason Clause and Both-to-Blame Collision Clause.
Owners shall deliver the cargo to a party or parties nominated by Charterers as Consignee written in the Waybill and once cargo has been thus delivered, Owners shall not be responsible for any non-delivery claim from other parties.

93. Drydocking :
No drydocking during the currency of this Charter Party except in the case of emergency.

## RIDER CLAUSES TO M.V. "NORDFLEX"
## CHARTER PARTY DATED 15TH NOVEMBER, 2007.

94.  <u>Sale</u> :
     The Owners shall have the option to sell the vessel at any time of the Charter with this Charter Party attached. Owners to give Charterers 45/30 days notice of change of ownership and then 15/7/5/3/2/1 days notice of actual handover. Owners shall in any case remain ultimately responsible for due fulfilment of the Charter Party.

95.  Owners have the right to change nationality of crew and flag and Charterers to be notified well in advance.

96.  <u>Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005</u> :
     (a)    Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

     The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

     The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

     (b)    Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that :

     (i)     the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
     (ii)    the Vessel shall be able to consume fuels of the required sulphur content

     when ordered by the Charterers to trade within any such zone.

     Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

     (c)    For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

97.  <u>ISPS/MTSA Clause for Time Charter Parties 2005</u> :
     (a)    (i)    The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

             (ii)   Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

             (iii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

     (b)    (i)    The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision :

- 14 -

**SSY**

SIMPSON SPENCE & YOUNG

**RIDER CLAUSES TO M.V. "NORDFLEX"**
**CHARTER PARTY DATED 15TH NOVEMBER, 2007.**

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

    (ii)    Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

    (c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

    (d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

98.    <u>U.S. Customs Advance Notification/AMS Clause for Time Charter Parties</u> :

    (a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense :

        i)    Have in place a SCAC (Standard Carrier Alpha Code);
        ii)    Have in place an ICB (International Carrier Bond);
        iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
        iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

    (b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

    (c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

    (d)    The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**BOTH TO BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply :-

**BOTH TO BLAME COLLISION CLAUSE**

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

- 15 -

**SSY**

SIMPSON SPENCE & YOUNG

### RIDER CLAUSES TO M.V. "NORDFLEX"
### CHARTER PARTY DATED 15TH NOVEMBER, 2007.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply :-

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

### GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

### U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April, 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but not further.

### CANADIAN CLAUSE PARAMOUNT

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights and immunities or an increase of any of its responsibilities or liabilities under the said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent but no further.

### BIMCO STANDARD WAR RISK CLAUSE FOR TIME CHARTERS, 2004
### (CODE NAME : "CONWARTIME 2004")

(a)    For the purpose of this Clause, the words :

(i)    "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

- 16 -

**SSY**

**RIDER CLAUSES TO M.V. "NORDFLEX"**
**CHARTER PARTY DATED 15TH NOVEMBER, 2007.**

SIMPSON SPENCE & YOUNG

(ii)    "War Risks" shall include any actual, threatened or reported :

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(d)    (i)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)    The Vessel shall have liberty :

(i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)    to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)    to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)    to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

**SSY**

SIMPSON SPENCE & YOUNG

RIDER CLAUSES TO M.V. "NORDFLEX"
CHARTER PARTY DATED 15TH NOVEMBER, 2007.

(g)   If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)   If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.